[S. F. No. 15075. In Bank.—August 6, 1934.]

THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA (a Public Corporation), Petitioner, v. CHARLES H. TOLL, as Treasurer, etc., et al., Respondents.

422

James H. Howard, Alan Patten and Charles C. Cooper, Jr., for Petitioner.

Robert H. Dunlap and George R. Larwill for Respondents.

SHENK, J.—*Mandamus* to compel the respondents as treasurer and controller of the petitioner district to transfer the sum of $352,800 from the "Colorado River Waterworks Bonds Election 1931 Fund" to the "Colorado River Waterworks Bonds Election 1931 Interest and Sinking Fund" pursuant to an ordinance of the board of directors of the district, adopted November 17, 1933, requiring them to do so. A general demurrer to the petition has been filed as a return to the alternative writ.

The district was organized and is functioning under the act of 1927. (Stats. 1927, p. 694.) On September 11, 1931, the board of directors of the district adopted an ordinance calling an election for the purpose of authorizing the issuance of $220,000,000 of bonds of the district for "acquisition and construction by said district of a certain public improvement, towit:" (describing it in detail). The purpose was to construct works for conducting water from the Colorado River to and for the use of the inhabitants in the district. On September 29, 1931, the election was held and the issuance of bonds in the sum above stated was authorized. After proceedings regularly taken the Reconstruction Finance Corporation of the United States offered to purchase $40,000,000 of such bonds bearing interest at the rate of five per cent per annum, payable semi-annually. Of this amount bonds in the sum of $6,048,000 had been issued and delivered at the time the petition herein was filed, to wit, December 28, 1933. Interest in the sum of $352,800 must be paid by a

tax levy during the current year unless such interest may be paid from the proceeds of bonds sold.

Construction work is in progress, but the improvement has not reached the stage where it is revenue-producing, and will not reach that stage in 1934 and probably not for several years to come. On November 17, 1933, the board of directors adopted an ordinance appropriating from the 1931 bond fund, being the proceeds from the sale of the bonds, said sum of $352,800 for the payment of said interest and authorizing and directing the respondents to transfer said sum from the 1931 bond fund to the 1931 interest and sinking fund for the purpose of making such payment from the latter fund. The respondents refused to make the transfer, assigning as the reason for their refusal the claim that such transfer is unauthorized and would be contrary to the laws governing the payment of interest on said bonds.

In 1931, when the bond issue was authorized by vote of the electors of the district, section 7 (a) of the act, pursuant to which the district was created, provided and now provides that the board of directors thereof, in initiating proceedings for the issuance of bonds of the district, shall by ordinance declare the necessity therefor and shall recite therein "the objects and purposes for which the indebtedness is proposed to be incurred". Section 7 (h) then provided that the proceeds of the bond issue "excepting premium and accrued interest, shall be placed in the treasury of said district to the credit of the proper improvement fund, and shall be applied exclusively to the purposes and objects mentioned in said ordinance. Premium and accrued interest shall be placed in the fund to be applied to the payment of interest on, and the retirement of, the bonds so sold." Section 7 (j) then provided and now provides as follows: "The board of directors shall fix such rate or rates for water furnished as will pay the operating expenses of the district, provide for repairs and depreciation . . . pay the interest on any bonded debt, and, so far as practicable, provide a sinking or other fund for the payment of the principal of such debt . . . ; it being the intention of this section to require the district to pay the interest and principal of the bonded debt from the revenues of such district, so far as practicable. If, however, . . . the revenues . . . shall be inadequate to pay the interest and

principal . . . the board of directors shall . . . levy and collect annually . . . a tax sufficient to pay the annual interest on such bonds, or such part thereof as shall not be met from revenues of the district . . . '' Section 8 then provided and now provides: ''On or before the twentieth day of August the board of directors of the district shall . . . determine the amount of money necessary to be raised by taxation during the fiscal year . . . and shall levy a tax accordingly; (1) sufficient to meet the interest and sinking fund requirements on all outstanding bonded indebtedness of said district; and (2) for all other district purposes.''

In 1933 section 7 (h) was amended by adding thereto the following: ''Provided that the interest on said bonds accruing during the construction period and for one year thereafter shall be deemed to be a construction cost within the meaning of the purposes and objects mentioned in said ordinance and such interest may be paid from said proceeds of the sales of such bonds.''

The question is whether proceeds from the sale of bonds issued for the acquisition and construction of the improvement may be used for the purpose of paying interest on such bonds during the period of construction.

As a problem of financing and accounting in the construction of buildings of a private nature it appears to be the accepted theory and practice to charge to the building account the interest paid to the mortgagee or bondholders during the period of construction. It is asserted by the petitioner, supported by appropriate references to textbooks and writers on economics, finance and accounting, and adjudicated cases in other jurisdictions, that in the public utility field generally, interest charges, while normally an unquestioned charge against revenue, may be and are now quite universally considered as capital expenditures. Such a concern borrows money with which to construct its plant, an enterprise which may require several years. During the period of construction and when no revenue is accruing, interest must be paid. To produce a plant or system ready for operation and the resulting revenue therefrom, there must be paid not only the cost of labor, materials, equipment and supervision, but also interest on borrowed money in order to finance the building operations. This interest is considered a part of the cost of construction and may

be paid from the capital account as a part of the cost of construction. In the field of eminent domain it has been said a fair rate of interest "upon the money invested in a plant during construction, and before completion, is as much a part of the cost of construction as is the money itself which is expended for materials and labor". (*Brunswick & Topsham Water District* v. *Maine Water Co.*, 99 Me. 371 [59 Atl. 537].) In the fixing of rates to be charged by public utilities, the practice of including interest during construction as a part of the cost of the property and therefore a capital expenditure has been recognized and approved. (*Des Moines Gas Co.* v. *Des Moines*, 238 U. S. 153 [35 Sup. Ct. 811, 59 L. Ed. 1244]; *Ohio Utilities Co.* v. *Public Utilities Com.*, 267 U. S. 359 [45 Sup. Ct. 259, 69 L. Ed. 656]; *Pioneer Telephone & Telegraph Co.* v. *Westenhaver*, 29 Okl. 429 [118 Pac. 354, 38 L. R. A. (N. S.) 1209].) Mr. John H. Bickley, engaged in financial and accounting work for the Pennsylvania Public Service Commission and a recognized authority on the subject, has said: "An examination of the uniform classification of accounts prescribed by the various state public service commissions, the Interstate Commerce Commission, the Federal Power Commission, and those recommended by national associations of utilities, reveals that they agree in charging to fixed capital interest paid on moneys borrowed for construction." (See article in Journal of Land & Public Utility Economics, vol. 1, No. 4, October, 1925, pp. 414–424.) The railroad commission of California is in accord with this practice (*City of Los Angeles*, 32 C. R. C. 579, 583; *Los Angeles Gas & Electric Corp.*, 35 C. R. C. 442, 451, and note 6, 453, and note 8.) This court has recognized the same rule in principle in *Reclamation District No. 1500* v. *Reclamation Board*, 197 Cal. 482 [241 Pac. 552].)

No good reason has been advanced why the same rule should not apply generally to the construction of publicly owned revenue-producing utilities financed by borrowed money. To follow the same accounting procedure would be within the necessarily implied powers of the district unless specifically or by necessary implication denied by the act of its creation or by some other statutory or constitutional limitation.

It is contended by the respondents that the enabling act, at the time the bonds were voted, should be construed so as to deny the power, although it did not specifically do so, and that the amendment of 1933, definitely conferring such power, was a legislative determination that the power did not theretofore exist. The purpose of the act was to provide for the acquisition and construction of such an improvement as is now under construction; and considering the act as a whole it was unquestionably intended that it should be a self-sustaining revenue-producing utility. It was found to be such by the federal government as a necessary condition in the purchase of the bonds from the federal treasury. It was contemplated that rates to be fixed by the board should provide sufficient revenue to pay the cost of the improvement, including all interest and principal on the bonds, and that direct taxation of property in the district should be resorted to only in the event such revenue shall be insufficient. Obviously no revenue would be forthcoming until the improvement was completed and in condition to produce revenue. If interest paid on outstanding bonds during construction may, as we hold, be classed as a capital expenditure, then it would seem that resort to taxation to pay the same would be justified only in the event the statute clearly commanded it. When section 7 (j) of the act lays upon the board the duty to levy a tax to pay the bond obligations, such duty is imposed when the revenue shall be inadequate to pay the same. The possibility of revenues permitting a reduction in the tax rate otherwise required was clearly contemplated. Since the district is still in its construction period and the system is not yet completed and no revenues are available, we do not at this time feel justified in declaring that a tax levy to pay interest is mandatory. This is especially true when the statute by its own terms and the entire bond proceedings indicate without question that the improvement was intended to be self-liquidating both as to the initial cost and the subsequent operation, and that the taxation features of the entire plan be a safeguard or insurance that the bond obligations will certainly be paid when due, by taxation if necessary.

The argument that the amendment of 1933 in providing that interest during the construction period shall be deemed a construction cost within the meaning of the pur-

poses and objects mentioned in the ordinance and may be paid from the proceeds of the sale of the bonds, necessarily implied a legislative determination that the statute prior to the amendment foreclosed the consideration of interest during construction as a construction cost, has been given due consideration. If the statute were clear to the effect that such interest could not be deemed a construction cost the contention of the respondents might well be sustained; but the amendment of 1933 may as well be deemed a legislative determination that the meaning of the prior statute was uncertain or doubtful and the amendment adopted for the purpose of clarification.

The respondents call attention to the fact that the legislature in 1923 in adopting the Bridge and Highway District Act (Stats. 1923, p. 452), provided specifically in section 21 that interest during construction might be paid from the principal obtained by the sale of the bonds; and the rule is invoked that where a statute with reference to one subject contains a given provision the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed. The rule is established, but its application here need not be recognized. This is so for the reason that while both statutes treat of related subjects, the specific right conferred and duty imposed by the one to pay such interest from capital should not be deemed a denial of the right necessarily implied by the other to follow the generally accepted practice.

We find nothing in *In re Metropolitan Water District*, 215 Cal. 582 [11 Pac. (2d) 1095], to compel a different conclusion. The statement there relied upon by the respondents is to the effect that current expenses of the district will have to be met by taxation, if necessary, before any revenue is produced from the new system. As has been seen, the paying of interest during construction is not a current expense as distinguished from a capital expenditure and resort to taxation is not necessary, when, as here, funds are available from the capital account. Other cases such as *City of Oakland* v. *Williams*, 107 Cal. App. 340 [290 Pac. 1044], and *Murphy* v. *City of Spokane*, 64 Wash. 681 [117 Pac. 476], are readily distinguishable on the facts and are not applicable here.

█ It is further contended by the respondents that the amendment of 1933 is invalid as applied to the entire bond issue as in violation of the federal and state Constitutions against impairment of contract obligations. The first contract claimed to be violated is the alleged contract between the taxpayer and the district arising under the statute and the bond proceedings leading up to the election, citing the familiar cases of *Merchants Nat. Bank* v. *Escondido Irr. Dist.*, 144 Cal. 329 [77 Pac. 937], *Peery* v. *City of Los Angeles*, 187 Cal. 753 [203 Pac. 992, 19 A. L. R. 1044], *O'Farrell* v. *County of Sonoma*, 189 Cal. 343 [208 Pac. 117], and others to like effect. The argument seems to be that the taxpayers have a contractual right to be taxed immediately for the payment of such interest and should not be compelled to await the uncertainty of having to be taxed later on in the event the revenues of the district be insufficient to retire the bond issue, both principal and interest. The novelty of such a claim suggests itself. The existence of a contract may not be questioned, but it would seem to be a benefit to the taxpayer to be relieved of present taxation with the prospect of relief altogether.

The second contract claimed to be violated is that arising between the bondholder and the district. The argument in this behalf proceeds upon the theory that the use of principal to pay interest during construction is an unauthorized diversion of the principal fund, that a different method for securing funds to pay such interest is substituted and the value of the investment diminished. The right of the bondholder is to have his interest and principal paid when due and it would seem to be of little concern to him from what fund his obligation is currently paid so long as that fund is, as to him, used for the objects and purposes for which the bonds were voted, viz., the construction of the improvement and he is secure in the ultimate payment by resort to taxation if the revenues be insufficient.

The whole argument as to the impairment of contract rights is based on the theory that under the original statute and proceedings thereunder certain contractual obligations arose and that under the amendment of 1933 a different contract is attempted to be evolved. Having in mind the conclusions first announced, namely, that the board had under the original statute the necessarily implied power to pay

interest during construction from the proceeds of the sale of the bonds, then the contract before and after the amendment of 1933 was not materially different and consequently no impairment has taken place.

It was settled in the case *Golden Gate Bridge & Highway District v. Filmer*, 217 Cal. 754 [21 Pac. (2d) 112, 91 A. L. R. 1], that an amendment to the statute extending the time for the payment of interest during construction for a period of six months after the completion of the improvement did not impair the obligation of any contract arising under the statute and proceedings for the issuance and sale of the bonds prior to the amendment. No reason has been suggested why the same rule should not apply to the provisions of the 1933 amendment of the Metropolitan Water District Act extending such time for a period of one year. Considering the magnitude of the undertaking we think the same rule should apply in the present case.

The foregoing disposes of all of the points made by the parties essential to a proper determination of the matter.

Let the peremptory writ issue as prayed.

Curtis, J., Waste, C. J., and Thompson, J., concurred.